IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARJORIE RIDDELL,                            )
                                             )
                Plaintiff,                   )
                                             )
          v.                                 )          Civil Action 04-108
                                             )
SLIPPERY ROCK UNIVERSITY, STATE              )
SYSTEM OF HIGHER EDUCATION,                  )
                                             )
                Defendant.                   )

MEMORANDUM ORDER

CONTI, District Judge

       In this memorandum order, the court considers the motion for summary judgment (Doc.

No. 30) filed by defendant Slippery Rock University ("defendant") with respect to all claims

against defendant asserted by plaintiff Marjorie Riddell ("plaintiff" or "Riddell").  After

considering the joint statement of material facts and the respective submissions of the parties, the

court will deny defendant's motion for summary judgment for the reasons set forth herein.


***Factual Background***

**I. Plaintiff's Employment**

        Plaintiff began her employment with defendant, a member of the Pennsylvania State

System of Higher Education, on or about April 4, 1986.  Complaint filed in Civil Action 04-108

("2004 Compl.") ¶ 8.  Plaintiff was hired to work in defendant's payroll department as a Clerk

Typist II.  Id.

The payroll department is a component of the accounting services department. Appendix to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. App."), Ex. 3 (Clerk II Typist Job Description for Marjorie Riddell) ¶8 (organizational chart). The director of the accounting services department was Mr. Tim Harlan. Id. The head of the payroll department was Mr. Don Bickel. Id. Mr. Bickel directly supervised two employees including plaintiff, who held the position of Clerk Typist II, and Janet McConnell, who held the position of Clerk Typist III. Id.; Joint Concise Statement of Material Facts ("J.S.") ¶¶2, 4.

Janet McConnell's primary function as a Clerk Typist III in the payroll department was to support the payroll manager during the relevant period, Mr. Bickel, by inputting the personnel and payroll transactions of students into the statewide computer system. J.S. ¶8 (emphasis in original). In addition to being in charge of student payroll, Ms. McConnell also did some clerical and support work as needed for Mr. Bickel. Pl. App., Ex. 2 at 10, lines 17-22. (February 10, 2005 Deposition of Donald A. Bickel) ("Bickel Dep."). According to Mr. Bickel, Ms. McConnell's work was more independent than that of plaintiff and was not verified by Mr. Bickel because she worked strictly with students, without the direct supervision of Mr. Bickel, inputting student hours verified by timesheets supplied by various departments. Id. at 35-36 ("Jan kind of runs her own process where I don't verify her work like I do Margie's.").

Plaintiff held the position of Clerk Typist II. J.S. ¶2. A Clerk Typist II is in pay scale group 3. J.S. ¶ 1. According to the job description, the duties of a Clerk Typist II include performing clerical work "of moderate complexity" which requires the utilization of typing skills and the processing of documents. The employee when processing documents performs a variety of functions including the verification of information, performing arithmetic calculations, coding,

2

and assisting the public in completing government forms.  J.S. ¶5 (quoting Appendix to

Defendant's Motion for Summary Judgment ("Def. App.") at 1 (state job classification for a

Clerk Typist II).  The duties also include, *inter alia,* typing correspondence, reports and

transmittals; the skilled utilization of specialized equipment such as mass storage typewriters and

computers; assuming responsibility for a significant aspect of a work process; providing

secretarial services; providing training and guidance to new employees; and fulfilling a lead

worker role for routine clerical operations.  J.S. ¶¶ 5-6; see also Def. App. at 1-3 (state job

classification for a Clerk Typist II).  Employees who are designated Clerk Typist II "work with

considerable independence within standard operating procedures[;] however, detailed

supervisory guidance and review is received for new or unusual situations and changes in

operating procedures and policies."  Id.

        Plaintiff's primary function in the payroll department was to provide clerical support to

the payroll manager by inputting personnel/payroll transactions of faculty and staff into a

statewide computer system.  J.S. ¶ 7 (emphasis in original).  Personnel/payroll transactions were

initiated by an employee with the human resources department ("human resources") whenever

that employee required a change to his or her payroll status.  J.S. ¶ 10.  For example, if an

employee wanted to change dependants or do anything affecting payroll or a payroll-related

classification, that employee would go through human resources.  Def. App. at 25 (Bickel Dep.).

Human resources would then send a written request together with a transaction request

transmittal to the payroll department for input into the statewide computer system.  J.S. ¶ 11.

Plaintiff would receive and process these transmittals by inputting them.  J.S. ¶ 12.  Plaintiff

testified that her job had changed during her tenure because at the time that she started working

as a Clerk Typist II this process only involved typing items that the Commonwealth would process; whereas, around the time that she began requesting desk audits, she not only was inputting the information but was processing it as well.  Pl. App., Ex. 1 at 14-15 (Excerpt from the Deposition Transcript of Marjorie Riddell) ("Riddell Dep.").[1]

As a Clerk Typist II, plaintiff was tasked to use computer-based systems to input data and generate employee payroll reports.  J.S. ¶ 9.  In order to accomplish this, she would obtain information from either a computer system or employee timesheets and input the data into a program to generate other reports.  Def. App. at 18 (Bickel Dep.).  Mr. Don Bickel, plaintiff's supervisor, testified in his deposition that plaintiff was also required to analyze this data to determine, for example, whether an employee was entitled to extra pay and whether overtime pay was accurately paid.  Id.  He further testified that after implementation of a new software package for human resources and payroll called the  "SAP System," Pl. App., Ex.1 at 57 (Riddell Dep.), she had to create reports within that system, and that in doing this, she was performing duties that were "definitely different than what she had been doing before under the old system."  Def. App. at 21-22 (Bickel Dep.) (emphasis added).

In addition to the foregoing, plaintiff independently researched exceptional payroll cases and problems and answered related questions when her supervisor was absent or on vacation, the frequency of which Mr. Bickel characterized as "occasionally."  Def. App. at 19-20 (Bickel Dep.).  Plaintiff also asserts that she was doing wage reports and query reports that were initially requested to be produced by Mr. Bickel because he could not "figure out the instructions" for

---

[1]The record does not indicate the date upon which plaintiff's deposition took place.  See Riddell Dep. at 1.

4

what was being sent.  Pl. App., Ex.1 at 90-91. (Riddell Dep.).  Plaintiff testified that this work

was either given to her by Mr. Bickel himself or he directed the requesting party to send it

directly to plaintiff instead.  Id.  Plaintiff testified that around this time she was doing "fiscal tech

professional type work" as opposed to clerk work about "99 percent of the time."  Id. at 91.

Plaintiff occasionally would volunteer for committees through the workplace, although

these types of duties were not assigned to her by her supervisor.  J.S. ¶ 52.  Her supervisor,

however, did not object to her participation in these projects to the extent that they did not

interfere with her assigned duties. J.S.¶ 53.  At his deposition, Mr. Bickel testified that plaintiff

was able to perform the job functions that were expected of her notwithstanding her participation

in those activities.  Def. App. at 22 (Bickel Dep.).

For example, plaintiff was invited to participate on the staff issues committee of the

president's commission for women.  Pl. App., Ex. 1 at 14-15 (Riddell Dep.).  She also was

invited to attend a "high-level cross functional transition impact meeting" regarding the

implementation of the SAP system.  Id. at 57-58.   This invitation was extended to her by

telephone by the chancellor's office of the State System of Higher Education on January 31,

2002.  J.S. ¶ 48.  Although the parties do not dispute that plaintiff agreed to attend, there is some

conflict as to whether or not she received her supervisor's assent prior to accepting the invitation.

J.S. ¶49-50.  She asserts that – in extending this invitation – her employer, defendant, was again

asking her to perform the duties of a Fiscal Technician.[2]  J.S. ¶47-8.

---

[2]The definition of "Fiscal Technician" provides that "[t]his is advanced clerical-accounting work involving the application of bookkeeping principles and practices.  An employee in this class performs advanced bookkeeping duties in recording, reviewing, processing and controlling financial records and documents.  Work involves examination of a variety of financial records and documents for propriety, quality and conformance to established accounting

Plaintiff ultimately did not attend that meeting and the events surrounding the cancellation of her attendance are in dispute.  Defendant contends that it reviewed the situation and determined that, in lieu of plaintiff attending, the payroll manager should attend.  J.S. ¶51. Plaintiff counters that one day before the meeting was to occur, an AFSCME[3] union representative, Karen Momberger, came to see her. Pl. App., Ex.1 at 58 (Riddell Dep.).  Plaintiff stated that because she was busy with preparations for this meeting, she asked the representative to make an appointment to see her at a later time.  Id.  The representative then told her that Lynne Moytl, then an employee working in the benefits area of the human resources department, later the director of human resources, Pl. App., Ex. 1 at 54, said that plaintiff did not do anything outside a clerk/typist job.  Id.; J.S. ¶51 (plaintiff's response).  Plaintiff informed Ms. Momberger that she was going to the "high-level cross functional transition impact meeting."  Pl. App., Ex.1 at 58.  Several hours later, Bill Elliot, then director of human resources,  J.S., Plaintiff's Facts ("Pl. Facts") ¶5, came to the payroll office and spoke to Mr. Bickel.  Id. at 59; J.S. ¶51 (plaintiff's response). Plaintiff contends that after Mr. Elliot departed, Mr. Bickel departed and when Mr. Bickel returned, he received a telephone call.  After the telephone call, Mr. Bickel informed plaintiff that her attendance at the meeting had been cancelled.  Id.; J.S. ¶51 (plaintiff's

---

procedures and maintenance of difficult bookkeeping systems.  Work frequently involves responsibility for the establishment and review of internal processing procedures.  Work is performed independently within a framework of prescribed accounting procedures and regulations.  Fiscal and accounting problems and irregularities are referred to a professional fiscal officer or accountant who reviews work periodically and upon completion for overall standards of performance."  Pl. App., Ex.6.

[3]"AFSCME" is the American Federation of State, County, and Municipal Employees labor union to which Ms.Riddell belongs.  Def. App. at 4 (plaintiff's classification grievance documentation).

response).  Mr. Bickel confirmed that some version of these events occurred, although in his

deposition he testified that he believed that Mr. Tim Harlan had replaced Mr. Elliot at the time

that the events occurred.  J.S. ¶51 (plaintiff's response) (citing Pl. App., Ex. 2 (Bickel Dep.) at

21-23).  Plaintiff testified that, as a result of not being allowed to go to the meeting about the new

software which plaintiff would be required to use, she had to learn the new software on her own.

Id. (citing Pl. App., Ex. 1 (Riddell Dep.) at 66-67, 106-07).

Plaintiff's position was reclassified from Clerk Typist II to Clerk II on or around

November 29, 2000.  Def. App. at 9 (Letter to Karen Momberger from State System of Higher

Education regarding plaintiff's grievance).  This reclassification did not result in a change in pay

grade.  Id.  On August 25, 2004, plaintiff's position was reclassified from Clerk II to Data

Analyst II and the reclassification was made retroactive to June 25, 2004.  Def. App. at 66 (Moytl

Aff.).  On July 27, 2005, plaintiff was offered a promotion to the position of payroll manager.

Def. App. at 76 (Letter from Dr. Robert M. Smith to Plaintiff).

## II.  Incidents in the Workplace prior to 2000

Plaintiff alleges that between 1993 and 1994, Mr. Bill Elliot subjected her to on-going

harassment that occurred at least once per week for approximately one year.  Pl. App., Ex.1 at

70-73 (Riddell Dep.).  She alleges that he made frequent visits to her work area and made

inappropriate comments to her, including that she "made his knees weak" and asking if she

wanted to work in his office  Id. at 71.  She testified that her co-worker and supervisor were

sometimes present in the area at certain times when Mr. Elliot approached her.  Id. at 74.  This

pattern continued, according to plaintiff, until Mr. Elliot asked her to work for him and she

indicated that she would not be comfortable with that arrangement.  Id. at 75.  The incident

7

during which Elliott made the job offer was the last time that he came into her office prior to the

visit when he allegedly had Mr. Bickel cancel plaintiff's trip to the high-level cross functional

transition impact meeting.  Id.

Plaintiff also alleges that at some time between 1994 and 1996, while she was changing

her clothes in the locker room adjacent to the racquetball courts at Marrow fieldhouse on

defendant's campus, she encountered a male voyeur.  Id. at 51-54, 76-79.  She reported the

incident to the dean of students, Dr. Ann Zimmerman,  Id. at 79, the vice president of student

affairs, Sharon Johnson, Id. at 80, and Bill Elliot, who was then in charge of defendant's police.

Id. at 81.  According to plaintiff, Mr. Elliott laughed about it and thought that it was "a big joke."

Id. at 53.  Plaintiff testified that it was later determined that the individual was a student.  Id. at

79, 80-81.  When plaintiff was appointed to the women's commission, she alleges that she tried

to get defendant to install an ID card-operated security system for the locker room areas similar

to those that existed at Clarion University and Indiana University of Pennsylvania, but that they

refused to implement her idea because it was too expensive.  Id. at 53-54.  According to plaintiff,

the voyeur was ultimately caught and disciplined in part because similar incidents continued to

be reported by other students.  Id. at 81.

### III.  Plaintiff's Request for Desk Audits and Initial Grievance in 2000

If an employee of defendant is requesting a review of his or her position, that employee

may file a classification appeal through the collective bargaining process.  Def. App. at 65 ¶4.

(Affidavit of Lynne Motyl) ("Motyl Aff.").   Alternatively, if a supervisor is requesting a review

of his subordinate's position, the supervisor may initiate a classification review under a different

administrative process.  Id.  An administrative process review can be initiated solely by an

employee's immediate supervisor by submitting a classification review form.  Id. at 65 ¶6.
Based upon approval granted up through the chain of command to defendant's vice president for
staff positions, a classification audit can then be conducted.  Id.

The collective bargaining process for filing a classification appeal is governed by Article
27 of the Master Agreement between the Commonwealth of Pennsylvania and AFSCME (the
"Master Agreement").[4]  Pursuant to Article 27, "[o]nly in those instances where there is a
substantial change in permanent job duties or job content . . . which justifies a change in job
classification, the employees may process an appeal for a reallocation of their position through a
grievance procedure as set forth in Article 37. . . ."  Def. App. at 51 (Article 27 of the Master
Agreement).

Plaintiff refers to her appeal for a reallocation of her position under the Master
Agreement as a "desk audit."  Pl. App., Ex.1 at 12 (Riddell Dep.).   Her appeal is also referred to
by defendant as a "position audit."  Def. App. at 49 (position audit report).  The desk audit or
position audit is a procedure by which the job functions performed by an employee are compared
with the applicable standards as established by the Commonwealth to make a determination
whether the employee's position is properly classified.   See Def. App. at 5 (plaintiff's
classification grievance document).

Plaintiff testified that she requested desk audits approximately every two years beginning
in 1990 because she believed that her job had significantly changed.  Pl. App., Ex. 1 at 10.  The
requests for a desk audit were made to her supervisor, Mr. Bickel.  Id. at 11.  Because the

_____

[4] The Master Agreement in its entirety is not part of the record.  Article 27 was submitted
in its entirety.  See Def. App. at 51.

requests did not result in desk audits, plaintiff testified that she filed a grievance with AFSCME

so that defendant "would be forced" to give her the desk audit.  Id. at 12.  Plaintiff testified that

she did not want to file a grievance because she felt she had been doing a very good job for

defendant, and that she filed a grievance "as a very last resort."  Id.

    Although plaintiff alleges that she made multiple requests for desk audits over the years,

see Amended Complaint filed in Civil Action 02-1286 ("2002 Compl."), later consolidated with

the above-entitled civil action, ¶15-20; 2004 Compl.¶ 10-11, the parties in their joint statement

of facts and briefs specifically focus on certain instances when she pursued reclassification.  For

example, the parties highlight plaintiff's filing of a classification grievance in August 2000,

which led to a desk audit.  See J.S. ¶31.  Plaintiff, desiring to have her position reclassified to

Fiscal Technician, filed a grievance with her union, AFSCME, pursuant to the Master

Agreement.  See Def. App. at 4-7 (plaintiff's 2000 grievance form);[5] Def. App. at 65, ¶5 (Motyl

Aff.).  Plaintiff's grievance form states that, "[g]rievant feels that she has been working at the

Fiscal Technician position" and that she "is seeking help to acquire the title that accurately

represents her current responsibilities."  Id.  The "Relief or Remedy Sought" was

"[r]eclassification to Fiscal Technician position which is justified by the level of work being

performed."  Id.

_____

        [5]The grievance form reflected the follow-up procedures taken by defendant.   Def. App. at
4 (plaintiff's 2000 grievance form). In the "Management Answer" portion of the grievance form,
defendant's personnel attest to their actions that are relevant to the grievance. "Response at
Step#"1 and "Response at Step#2" are discussed herein.  The form is blank as to "Response at
Third Step" and "Response at Fourth Step."  Id.

The grievance form allotted space for management to respond to the grievance.  Id.  The "Management Answer" as to "Step#1," "Response at First Step," on the form which was signed by plaintiff's supervisor, Mr. Bickel, states that he was not able to  make classification decisions, and that he was in "general agreement" that the attached job description (Clerk Typist II) fit the job duties performed by plaintiff.  Id. at 5.  His signature underneath this typed statement was dated August 28, 2000.  Id.  The form also reflects the results of a desk audit conducted on September 13, 2000, by reviewing analyst, Sandra E. Grosky.  Id. at 5 ("Step#2," "Response at Second Step"); see Def. App. at 49-50 (position audit report).  Ms. Grosky examined the nature and scope of plaintiff's position, including her reporting relationship, contacts, duties and responsibilities, and problems/challenges confronted.  Id.

In her report, Ms. Grosky details a discussion that she had with Mr. Bickel, plaintiff's supervisor, during which he observed that plaintiff was involved with the "HRIS system" as plaintiff had been since its inception and that plaintiff used the system efficiently in her work.  Id. at 50. According to Ms. Grosky's report, Mr Bickel told Ms. Grosky that he felt that the use of the system made plaintiff's job easier and faster to accomplish, thereby leaving time for her to devote to committee work.  Id.  He observed that he "closely reviews" plaintiff's work because it was his responsibility to ensure the accuracy of the defendant's payroll.  Id.  There is a conflict in the record regarding this conversation because Mr. Bickel testified that he did not recall being contacted in connection with a desk audit until 2004.  See Pl. App., Ex.2 at 16-18 (Bickel Dep.).

Ms. Grosky further noted in her report that, contrary to plaintiff's assertion, plaintiff was not performing the advanced clerical-accounting work of a Fiscal Technician, but rather was performing work that followed "standardized procedures and processes" involving "verifying

comparing, calculating and coding information which is reviewed by the supervisor." Def. App. at 50 (position audit report). Ms. Grosky also noted that in a payroll summary prepared after the on-site review, plaintiff represented that she did "other duties as assigned" which included committee work with the continuous improvement coordinating council. Id. Ms. Grosky observed that both Mr. Bickel and she questioned the use of the phrase "as assigned" and that plaintiff's involvement with the committee was not a work assignment, although she had been invited to serve by defendant's president. Id. Ms. Grosky ultimately concluded that "the position is properly classified as clerk typist 2." Id. This report was summarized on plaintiff's grievance form in the portion of the form providing for the management answer in "Step#2," "Response at Second Step." Def. App. at 4 (plaintiff's 2000 grievance form); see also J.S. ¶36.

At the third step of the grievance process, after Ms. Grosky's audit, the department of human resources determined that plaintiff's position should be laterally reclassified from Clerk Typist II to a Clerk II since it was determined that "the clerk 2 classification is most descriptive" of plaintiff's responsibilities. Def. App. at 12 (Letter from Lynne Moytl to plaintiff); see J.S. ¶38. This lateral reclassification did not result in a change in plaintiff's pay rate. Id. Plaintiff was notified of this change in writing by letter dated December 5, 2000. Id.; J.S. ¶39.

Karen Momberger, AFSCME district council representative, communicated to plaintiff on December 5, 2000, that the grievance would be moved to the fourth step of the grievance procedure. Def. App. at 10 (letter from Karen Momberger to plaintiff). The fourth step includes an informal hearing with a representative from the office of administration, during which the representative would review the job description and ask for examples and explanations of the duties plaintiff performs. Id. Ms. Momberger stated that there is sometimes difficulty with

12

scheduling fourth step hearings and that she might move the grievance to the arbitration step,

although this did not mean that it would be arbitrated.  Id. Accordingly, on December 5, 2000, Ms.

Momberger notified Mr. Mike Sullivan with the bureau of personnel, grievance classification unit,

that she was appealing the grievance to the fourth step of the grievance procedure on behalf of

plaintiff.  Def. App. at 11 (letter from Karen Momberger to Mr. Sullivan).  The outcome of the

fourth step is not clear from the record.  See Def. App. at 5 (blank at Step 4).

**III. Plaintiff's First Charge of Discrimination to the EEOC**

On February 25, 2002, plaintiff filed her first complaint with the Equal Opportunity

Employment Commission ("EEOC").  J.S. ¶ 43.  In it, plaintiff alleged discrimination based upon

sex and retaliation, citing the January 12, 2001 decision denying her reclassification request as the

basis of the allegation of sex discrimination and the August 16, 2000 filing of her classification

grievance as the bases of her allegation of retaliation.  J.S. ¶ 43-7; Def. App. at 56 (2002 EEOC

charge).  In addition, plaintiff cited the January 31, 2002, invitation from the chancellor's office to

attend the high-level cross functional transition impact meeting as a request by her employer for

her to perform the duties of a Fiscal Technician**.**  J.S.¶ 47.

In a letter dated April 26, 2002, the EEOC advised plaintiff that her allegations could not

be substantiated and advised her of her right to sue.  Def. App. at 62-3.  Plaintiff filed a complaint

with this court on September 23, 2002.  (Doc. No.4  in Civil Action 02-1286).  Plaintiff filed an

amended complaint in that civil action on September 2, 2003.  (Doc. No.14  in Civil Action 02-

1286).  Defendant filed a motion to dismiss counts III and IV of the amended complaint (Doc.

No.15  in Civil Action 02-1286), which was granted on November 25, 2003.  (Doc. No.15 in 02-

1286.)  On March 2, 2004, Civil Action 02-1286 was consolidated with this case for discovery and trial.  (Doc.22 in Civil Action 02-1286).

**IV.  Plaintiff's Request for a Desk Audit in 2003**

On February 25, 2003, plaintiff, believing that she was performing the duties of a Fiscal Technician, requested another desk audit of her position.  Def. App. at 64 (letter from Marjorie Riddell to Donald Bickel).  This desk audit was never performed. J.S. ¶ 62.  The parties disagree about the reasons for this disposition.

Defendant asserts that if an employee is requesting a review of that employee's position, that employee may file a classification appeal through the collective bargaining process.  Def. App. at 65, ¶4. ( Motyl Aff.).   Due to the already pending litigation, defendant wrote a letter to plaintiff asking her to clarify the basis for her request, as it was unclear to defendant whether the request was related to the litigation. Def. App. at 71 (letter from Lynne Motyl to Marjorie Riddell).   Ms. Motyl asked that if the request was not related to the litigation, plaintiff should indicate whether it was being requested as part of an administrative process or through an employee appeal as defined in the Master Agreement.  Def. App. at 65, ¶2. ( Motyl Aff.).   In any case, plaintiff was asked to provide a job description, pursuant to Article 27, Section 1 of the Master Agreement. Id. ¶5.  Defendant asserts that a desk audit was not conducted because plaintiff never provided the document requested.  Def. App. at 65-70.

Plaintiff counters that she had made numerous requests for desk audits prior to the 2003 request utilizing the same procedure that she utilized in 2003, i.e., making a request through her supervisor.  Pl. App., Ex. 1 at 10-11 (Riddell Dep.).  She further states that she did not provide a

job description because she previously had requested desk audits through Mr. Bickel and human resources already possessed this document.  J.S. ¶61 (plaintiff's response).

On the basis that this desk audit was never performed, plaintiff filed another complaint with the EEOC on August 28, 2003, referenced as EEOC Charge No. 172-2003-01675.  J.S. ¶63. In this complaint, she alleged discrimination on the basis of sex and retaliation.  J.S. ¶64. In her charge of discrimination, plaintiff stated that she is doing "the job of a Fiscal Technician" while defendant continues to pay her as a Clerk II.  Def. App. at 73  (EEOC charge of discrimination).  She also alleged that there are other male fiscal technicians in the system who are doing similar work and that she is not being promoted because of her gender.  Id.   Plaintiff cites the February 25, 2002 filing of her EEOC charge of discrimination as the basis for her allegation of retaliation.  J.S. ¶66.   These proceedings with the EEOC were followed by the filing of the complaint in this action. (Doc. No.1 in 04-108).  Civil action numbers 02-1286 and 04-108 were consolidated on March 3, 2004.  (Doc. No. 5 in 04-108).  On October 28, 2005, defendant filed the motion for summary judgment at issue. (Doc. No. 31 in 04-108).  In a subsequent filing in this matter, plaintiff withdrew her claim of retaliation.  Pl. Br. In Opp. to Def.'s Mot. for Summary Judgment at 15.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the

mere existence of some disputed facts, but will be defeated when there is a genuine issue of

material fact.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  In determining

whether the dispute is genuine, the court's function is not to weigh the evidence or to determine

the truth of the matter, but only to determine whether the evidence of record is such that a

reasonable jury could return a verdict for the non-moving party.  <u>Id.</u> at 249.  The court may

consider any material or evidence that would be admissible or usable at trial in deciding the merits

of a motion for summary judgment.  <u>Horta v. Sullivan</u>, 4 F.3d 2, 8 (1st Cir. 1993) (citing WRIGHT

AND MILLER, FEDERAL PRACTICE § 2721); <u>Pollack v. City of Newark</u>, 147 F.Supp. 35, 39 (D.N.J.

1956), <u>aff'd</u>, 248 F.2d 543 (3d Cir. 1957), <u>cert.denied</u>, 355 U.S. 964 (1958) ("in considering a

motion for summary judgment, the court is entitled to consider exhibits and other papers that have

been identified by affidavit or *otherwise made admissible in evidence*") (emphasis added).


### *Discussion*

        In order to address defendant's motion for summary judgment and plaintiff's response, the

court will discuss three issues: (1) whether plaintiff's discrimination claims concerning the

grievance she filed in 2000, which are the basis for her February 2002 EEOC complaint, are time-

barred; (2) whether, with respect to any claims that are not time-barred, there remains a genuine

issue of material fact regarding whether plaintiff was qualified for the position of Fiscal

Technician; and (3) whether, even assuming plaintiff made out a prima facie case of

discrimination, defendant is entitled to summary judgment because there is no genuine issue of

material fact concerning defendant's reasons for not reclassifying plaintiff as Fiscal Technician.

The court will consider each of these issues in turn.

**I.  Whether plaintiff's discrimination claims concerning the grievance that she filed in 2000, which are the basis of her February 2002 EEOC charge, are time-barred**

It is well established that the filing of a timely EEOC charge is a prerequisite to invoking federal jurisdiction over an employment discrimination claim.  Krouse v. American Sterilizer Co., 984 F. Supp. 891, 913 (W.D. Pa. 1996) (citing Ostapowicz v. Johnson Bronze Co., 541 F.2d 394 (3d Cir.1976), cert. denied, 429 U.S. 1041 (1977)).  Title VII sets forth the following discrete timing requirements that must be satisfied prior to a plaintiff initiating a civil action for discrimination:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

42 U.S.C.§ 2000e-5(e)(1) (emphasis added); see also National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) ("The operative terms are 'shall,' 'after . . . occurred,' and 'unlawful employment practice.'  'Shall' makes the act of filing a charge within the specified time period mandatory.").  Defendant acknowledges that plaintiff had 300 days to file her complaint. Plaintiff, therefore, unless some equitable or other exception were to apply, should have filed her charge with the EEOC within 300 days of the events that occurred in the late summer and fall of 2000 relating to that classification grievance and desk audit.  See Morgan, 536 U.S. at 110 ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'  A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability

17

to recover for it."). These events include the filing of her grievance on August 16, 2000; the desk audit, or position audit, conducted on September 13, 2000; the lateral reclassification to Clerk II of which plaintiff was notified by letter dated December 5, 2001; and the denial of her request to be reclassified to Fiscal Technician II of which plaintiff was notified by letter dated January 12, 2001. Assuming the facts in a light most favorable to plaintiff, the non-moving party, the court notes that, to file her charge concerning these events within the requisite 300 day time period, plaintiff would have needed to file her EEOC charge on or around November 8, 2001 – 300 days after the notification that her request to be reclassified ultimately was denied. Plaintiff, however, did not file her charge until February 25, 2002 – 409 days after her request was denied. Defendant, therefore, argues that plaintiff is barred from recovering for these claims, and any claims based upon acts occurring before May 2001. (The putative 300-day period preceding February 25, 2002, begins on May 1, 2001.)

Plaintiff, in response, relies upon the continuing violation doctrine as a ground to save these otherwise time-barred claims. Plaintiff's reliance, however, is unavailing. Under the continuing violation doctrine, as plaintiff correctly notes, a "plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995); see Rush v. Scott Specialty Glass, Inc., 113 F.3d 476, 481 (3d Cir. 1997). "To establish that a claim falls within the continuing violations theory, the plaintiff must do two things. First, he must demonstrate that at least one act occurred within the filing period: 'The crucial question is whether any present violation exists.'" Id. at 754-55 (quoting United Airlines, Inc. v. Evans, 431 U.S. 553, 558 (1977)). "Next, the plaintiff must

18

establish that the harassment is 'more than the occurrence of isolated or sporadic acts of intentional discrimination.'" Id. (quoting Jewett v. International Tel. and Tel. Corp., 653 F.2d 89, 91 (3d Cir), cert. denied, 454 U.S. 969 (1981)).  "The relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern." Id. As a result, once a plaintiff has alleged sufficient facts to support use of the continuing violation theory, the 300-day filing period becomes irrelevant as long as at least one violation has occurred within that 300 days. Id.  The plaintiff may offer evidence of, and recover for, the entire continuing violation. Id.

As noted by the United States Court of Appeals for the Third Circuit in West and Rush, a number of the federal courts of appeals, including the United States Court of Appeals for the Third Circuit, followed the approach of the United States Court of Appeals for the Fifth Circuit as set forth in Berry v. Board of Supervisors of Louisiana State University, 715 F.2d 971, 981 (5th Cir. 1983) (a "non-exhaustive," "multi-factor" test for examining the issue of whether the acts in question are "isolated, intermittent acts of discrimination" or part of a "persistent, on-going pattern). See West, 45 F.3d at 755 n.9; Rush, 113 F.3d at 481.  "Following the Berry court, the inquiry into the existence of a continuing violation would consider: (i) subject matter – whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence – whether the nature of the violations should trigger the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." West, 45 F.3d at 755 n.9 (quoting Martin v. Nannie and Newborns, Inc., 3 F.3d 1410, 1415 (10th Cir.1993), overruled in part by Davidson v. Am. Online, Inc., 337 F.3d 1179 (10th Cir.2003)).  In addition, as defendant points out, the United States Court

of Appeals for the Third Circuit has held that a failure to promote is a discrete instance of discrimination.  Rush, 113 F.3d at 483-4.

The United States Supreme Court, however, subsequent to the decisions of the United States Court of Appeals for the Third Circuit in West and Rush revised the standards that courts must apply in determining the timeliness of Title VII claims when the continuing violation doctrine is invoked, resolving in part the different tests employed by the various federal Courts of Appeals.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); see also Davidson, 337 F.3d at 1184 (recognizing this revision).  In so doing, the Supreme Court broadly affirmed the approach taken by the United States Court of Appeals for the Third Circuit.

In Morgan, the Supreme Court held that a continuing violation theory of discrimination is not permitted for claims concerning discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or a refusal to hire.  Morgan, 536 U.S. at 114.  For these discrete acts, a claimant must file a charge of discrimination within the appropriate limitations period for each such discrete act of discrimination that occurred.  Id. at 112.  The Supreme Court emphasized the principle that "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." Id. at 113.  Rather, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Id.  The Supreme Court, however, made clear that the statutory time period does not bar a plaintiff from using the prior acts, otherwise time-barred, as background evidence in support of a timely claim.  Id.; see Davidson, 337 F.3d at 1184 n.2 ("The Court noted, however, that the statute does not bar an employee from using time-barred acts as background evidence in support of a timely claim.") (citing Morgan, 536 U.S. at 113).

The Supreme Court in <u>Morgan</u> held that, while a theory of a continuing violation would be unavailing to save otherwise time-barred claims concerning discrete acts of discrimination such as the failure to promote, hostile work environment claims are "different in kind" from discrete acts of discrimination because "[t]heir very nature involves repeated conduct." <u>Morgan</u>, 536 U.S. 115. With respect to hostile work environment claims, the Supreme Court noted that the "unlawful employment practice" cannot be said to occur on any particular day, but instead that it occurs over a series of days or perhaps years and "in direct contrast to discrete acts, a single act of harassment [underlying a hostile work environment claim] may not be actionable on its own." <u>Id.</u>  The Supreme Court expressly held, with respect to hostile work environment claims, that "[g]iven, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." <u>Id.</u> at 118.  "In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." <u>Id.</u>

In this case, plaintiff argues that claims relating to acts occurring before May 2001 – including the filing of a grievance on August 16, 2000; the desk audit conducted on September 13, 2000; the lateral reclassification to Clerk II of which plaintiff was notified by letter dated December 5, 2001; and the denial of her request to be reclassified to Fiscal Technician of which plaintiff was notified by letter dated January 12, 2001 – constitute grounds for "not merely a failure to promote claim," but rather for a pattern of salary discrimination that is recognized under the continuing violation doctrine.  <u>See</u> Pl.'s Br. in Opp. to Def.'s Mot. for Summary Judgment at 3-5.  Plaintiff's claims, however, are not hostile work environment claims.  Under the analysis set forth by the United States Supreme Court in <u>Morgan</u>, this court cannot recognize the acts

21

underlying plaintiff's claims as proper grounds for a continuing violation theory.  The acts and events at issue are discrete acts and events which constitute instances in which defendant failed to promote plaintiff.

In addition, under the applicable precedent set forth by the United States Court of Appeals for the Third Circuit prior to Morgan which plaintiff relies upon in her brief, to the extent that it was not overruled by Morgan, plaintiff's claims still fail to qualify as acts that could support a continuing violation theory of discrimination.[6]  That is, under the factors set forth in Berry, this court's inquiry into the existence of a continuing violation prior to Morgan would have taken into account, inter alia, the degree of permanence of the acts at issue – i.e., whether the nature of the alleged violations – here, the acts surrounding defendant's decision not to reclassify plaintiff – should have triggered plaintiff's awareness of the need to assert her rights, and whether the consequences of the failure to reclassify plaintiff would continue even in the absence of a continuing intent to discriminate.  See West, 45 F.3d at 755 n.9.   On these facts, defendant's denial of plaintiff's request for a reclassification in light of the formal grievance procedures and the desk audit that took place had a sufficient "degree of permanence" that it should have put plaintiff on notice that she needed to assert her rights if she believed that the acts surrounding defendant's failure to reclassify her constituted illegal discrimination.

---

[6]The court notes that the Supreme Court in Morgan affirmed and did not disturb the main principle underlying West and Rush.  The key issue in determining whether the continuing violation doctrine should be applied to toll the statute of limitations in a Title VII case is whether the acts at issue are isolated, intermittent acts or are instead part of a persistent, on-going pattern of discrimination.  See West, 45 F.3d at 755.  The Supreme Court held that in the case of discrete acts – including a failure to promote – otherwise time-barred claims cannot be saved by appealing to the continuing violation doctrine.

Indeed, as the United States Court of Appeals for the Third Circuit stated prior to Morgan, "[t]he consideration of 'degree of permanence' is the most important of the factors." Cowell v. Palmer Township, 263 F.3d 286, 292 (3d Cir. 2001) (citing Berry, 715 F.2d at 981) (in the context of a section 1983 substantive due process claim, discussing and applying the continuing violation doctrine as set forth in West and Berry). In determining whether the acts have a "degree of permanence" which should trigger a plaintiff's awareness of and duty to assert her rights – courts were instructed to consider the policy rationale behind the statute of limitations. See id. at 295. In light of the policy rationale, "the continuing violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims." Id. (citations omitted). "On the contrary, 'if prior events should have alerted a reasonable person to act at that time, the continuing violation theory will not overcome the relevant statue of limitation.'" R&J Holding Co. v. Redevelopment Auth. of Montgomery, 165 Fed.Appx.175, 181 (3d Cir. 2006) (quoting King v. Twp. of E. Lampeter, 17 F.Supp.2d 394, 416 (E.D.Pa.1998)).

Because there is no genuine issue of material fact  in dispute concerning the relevant dates and plaintiff's claims relating to her first charge of discrimination with the EEOC are based upon discrete acts surrounding plaintiff's failure to promote claim, those claims are time-barred as a matter of law. Summary judgment must be granted in favor of defendant with respect to these claims. The court notes, however, that evidence concerning these claims, as well as other incidents that occurred prior to 2000, may be admissible as background evidence in support of plaintiff's timely claims. See Morgan, 536 U.S. at 113.

23

**II.  Whether there remains a general issue of material fact regarding plaintiff's qualification for the  position of Fiscal Technician**

Since its inception, Title VII has made it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  The Supreme Court clarified the applicable rules as to order and burden of proof with respect to Title VII claims in McDonnell Douglas Corp. v. Green, noting that Title VII claims often involve opposing factual contentions concerning whether an employer acted with the intent to discriminate or for some other reason.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973).  In McDonnell Douglas, the Supreme Court established the now-familiar burden-shifting framework for examining employment discrimination claims under Title VII.  Id. at 802.

The parties do not dispute that plaintiff's remaining failure to promote claims under Title VII require application of the familiar tripartite burden-shifting framework the Supreme Court articulated in McDonnell Douglas.  Id.  The McDonnell Douglas analysis requires that the plaintiff demonstrate a prima facie case of discrimination.  Id.  If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the unfavorable employment decision.  Fuentes v Perskie, 32 F.3d 759, 763 (3d.Cir. 1994).  The burden on the defendant at this stage is "relatively light," and the defendant "satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  Id. (emphasis added)(citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

24

The employer need not prove that the tendered reason actually motivated its behavior because throughout this burden-shifting paradigm, the ultimate burden of proving intentional discrimination always rests with the plaintiff.  Id. (citing Texas Dept. of Cmty. Affairs v. Burdine,101 S.Ct. 1089, 1093 (1981)).  Once the employer articulates a legitimate reason for the unfavorable employment decision, the burden of production reverts to the plaintiff, who must then show by a preponderance of the evidence that the employer's explanation is pretextual.  Id.  That is, plaintiff must put forth evidence from which a jury could conclude that the defendant's purported reasons for the adverse employment action were a pretext for intentional discrimination. See Jones v. School District of Philadelphia, 198 F.3d 403 (3d Cir. 1999).

Under the first prong of the McDonnell Douglas analysis, a plaintiff must establish a prima facie case of discrimination.  Id., 411 U.S. at 802.  The specific items of proof required to make out a prima facie case vary according to the factual setting at issue.  Id. at 802 n.2.  To make out her prima facie failure to promote case, plaintiff must establish that (1) she belongs to a protected category; (2) she applied for and was qualified for a job in an available position; (3) she was rejected; and (4) after she was rejected, the position stayed open and the employer continued to seek applications from similarly qualified individuals.  Bray v. Marriot Hotels, 110 F.3d 986, 990 (3d Cir.1997).  As noted in Bray, with respect to the fourth element, whether a position remains open or was filled is not material.  Id. at 990 n.5 ("[T]his variance from the letter of the McDonnell Douglas Corp. formula is not relevant to our analysis. 'The facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to different factual situations.'") (quoting McDonnell Douglas, 411 U.S. at 802 n. 13).  What is key to plaintiff's prima facie case is that the adverse employment

action – the failure to promote in these kinds of cases – gives rise to an inference of discrimination.  See McDonnell Douglas, 411 U.S. at 803.

The parties here do not dispute that plaintiff is a member of a protected class or that she was subjected to adverse employment action in the form of a failure to be reclassified or promoted to a Fiscal Technician pay grade.  The positions of the parties diverge, however, with respect to the second element: plaintiff argues that she is qualified for the Fiscal Technician position and defendant argues that she is not.

At the prima facie stage, the court views plaintiff's qualifications objectively, examining whether a plaintiff has the experience and education necessary to be a viable candidate for the position at issue.  See Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir.1995); Kepple v GPU, Inc., 2 F.Supp.2d 730, 741 (W.D.Pa 1998).  The requisite objective criteria regarding experience and education for a particular job are established by the employer.  Kepple v GPU, Inc., 2 F.Supp.2d 730, 741 (W.D.Pa 1998) (citing Rhett v. Carnegie Center Assoc. (In re Carnegie Center Assoc.), 129 F.3d 290, 298 (3d Cir.1997)).  That is, the employer is entitled to establish the job requirements and the plaintiff must offer more than his own opinion that he is qualified for the position in support of his argument that he is qualified.  See In re Carnegie Center Assoc., 129 F.3d at 298.

Defendant contends that plaintiff is not qualified for the Fiscal Technician position under the objective criteria set forth in the job description and that plaintiff has offered nothing other than a "subjective assertion" regarding her own qualifications as the basis for her contention that she should have been reclassified as a Fiscal Technician.  First, defendant makes much of the fact that the existing Fiscal Technician positions in the department in which plaintiff worked at the

time of the alleged discriminatory acts were Fiscal Technician <u>Supervisory</u>, implying that plaintiff was seeking this position.  Defendant asserts that since plaintiff's position did not involve fiscal or supervisory responsibilities, she is not qualified for this job.  The court finds this argument, however, to be  unavailing because the Fiscal Technician <u>Supervisory</u> position is distinct from the Fiscal Technician position, Def. App. at 26-29 (Fiscal Technician Supervisory and Fiscal Technician job descriptions), and plaintiff sought reclassification to Fiscal Technician, not Fiscal Technician <u>Supervisory</u>, in both her time-barred August 16, 2000 AFSCME grievance, Def. App. at 4 (plaintiff's classification grievance document), and her August 28, 2003 EEOC complaint. Def. App. at 73.  There is nothing in the record that suggests that plaintiff desired to be reclassified to Fiscal Technician <u>Supervisory</u> or grieved the fact that she was not so classified.  It follows, therefore, that her qualifications, or lack thereof, for a position that she did not seek are irrelevant for the evaluation of her prima facie case.

Defendant next argues that according to the Fiscal Technician job description, Def. App. at 28, a Fiscal Technician must be able to apply bookkeeping principles and practices.  Defendant supplies a dictionary definition from a dictionary for accounting for "bookkeeping principles and practices" which includes a further reference to the term "double entry bookkeeping" upon which defendant relies.  Def. Br. In Support of Motion for S.J. at 12, FN1.  Defendant asserts that plaintiff did not perform these kinds of duties, nor some of the other duties described in the Fiscal Technician job description, such as posting and maintaining ledgers, budgetary control accounts, computing payroll and bookkeeping duties.  <u>Id.</u> at 12.  Because plaintiff did not perform these job functions, defendant concludes that she is not qualified to be a Fiscal Technician.

Plaintiff, however, argues that she had the "Minimum Experience and Training" required for the Fiscal Technician position – which requires as one alternative "three years of work involving the maintenance of fiscal or financial records, including one year of responsible work which involves the application of accounting or fiscal principles and practices; and graduation from high school." Pl.'s App., Ex. 6 (job description for Fiscal Technician).  In addition, plaintiff provides a  laundry list of duties that she asserts that she performed over a course of years that may fall within the scope of the Fiscal Technician job description.  These duties include processing payroll documents; analyzing data for accuracy and compliance; calculating taxes, gross, and retroactive pay; and preparing and maintaining payroll reports.  Pl. App. Ex.1 at 26 (Riddell Dep.).  Some of these duties considerably overlap with duties explicitly listed as "Examples of Work Performed" by a Fiscal Technician.  Id.   For example, "[r]eviews, posts, and processes a variety of financial, payroll, or audit documents" and "maintains a payroll including posting changes, auditing for completeness, reviewing input and output form the payroll system, and preparing payroll reports" describe in part some of the duties that plaintiff testified that she did.  Id.  She also asserts that she worked independently within a prescribed framework, resolving complicated payroll problems which otherwise would be handled by her supervisor when he was absent or needed assistance or when she was contacted directly by other departments.  Id. at 15-16.

The deposition testimony of plaintiff's supervisor, Mr. Bickel, seems to corroborate some of plaintiff's assertions and undermines defendant's assertion that the evidence is undisputed that plaintiff did not exercise the requisite discretionary judgment required of a Fiscal Technician.  See Pl. App. Ex.2 at 11, 28, 30, 33-36 (Bickel Dep.).  Specifically, Mr. Bickel testified that (1) in

28

addition to administrative functions, plaintiff sometimes did technical and professional work,
Bickel Dep. at 11, 28; (2) upon discussing plaintiff's desire to be reclassified with her, he
"thought she had a point," id. at 30; (3) plaintiff did do some evaluation of data, including reports
on extra pay, and whether extra pay and overtime were correctly paid, id. at 33; and (4) although
plaintiff did not do what an accountant would do, she handled exceptional problems that Mr.
Bickel would otherwise handle "occasionally" when Mr. Bickel was on vacation, not in the office,
or away from his desk – if he was not around and she answered his phone and could handle the
issue, she did so without his supervision, id. at 34-35 ("[S]he will answer my phone.  A lot of
times if she can research it and answer it, she does.").  For these reasons, defendant is not entitled
to summary judgment based upon its argument that plaintiff cannot state a prima facie case of
discrimination.  The court finds that summary judgment cannot be granted in favor of defendant
on this ground because the evidence of record is such that a reasonable jury could find that
plaintiff was qualified for the position of Fiscal Technician and,  therefore, could return a verdict
for plaintiff, the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).
The court notes that plaintiff addresses the fourth element of the prima facie case.  Defendant,
however, did not address this element in its motion for summary judgment and thus the court need
not address it.

**III.  Whether, even assuming plaintiff made out a prima facie case, defendant is entitled to
        summary judgment because its reasons were not pretextual_____**



Under the burden-shifting framework set forth in McDonnell Douglas, if a plaintiff
establishes a prima facie case, the burden of production shifts to the defendant to articulate a
legitimate, non-discriminatory reason for the unfavorable employment decision.  Fuentes v
Perskie, 32 F.3d 759, 763 (3d.Cir. 1994).  The burden on the defendant at this stage is "relatively

29

light," and the defendant "satisfies its burden of production by introducing evidence which, <u>taken as true</u>, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Id.</u> (emphasis added).  The employer need not prove that the tendered reason actually motivated its behavior because throughout this burden-shifting paradigm, the ultimate burden of proving intentional discrimination always rests with the plaintiff.  <u>Id.</u>   Once the employer articulates a legitimate reason for the unfavorable employment decision, the burden of production reverts to the plaintiff, who must then show by a preponderance of the evidence that the employer's explanation is pretextual.  <u>Id.</u>

In <u>Fuentes</u>, the United States Court of Appeals for the Third Circuit clarified the proper standard for determining whether to grant or deny summary judgment in a claim arising under Title VII.  <u>Id.</u> at 761-62.  The court of appeals considered the kind of evidence that a plaintiff who has made out a prima facie case must adduce to survive a motion for summary judgment when the defendant offers a legitimate reason for its employment action in a "pretext" employment discrimination case.  <u>Id.</u> at 762.  The court of appeals held that to survive a motion for summary judgment when the defendant offers a legitimate reason for its employment action,

> the plaintiff generally must submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

<u>Id.</u>

The court of appeals reached this holding reasoning that "[a]t trial, the plaintiff must convince the factfinder 'both that the reason was false, and that discrimination was the real reason.'" <u>Id.</u> at 763 (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515-16 (1993)).  "To

prevail at trial, the plaintiff must prove not that the illegitimate factor was the <u>sole</u> reason for the decision, but that the illegitimate factor was a <u>determinative</u> factor in the adverse employment decision, that is, that but for the protected characteristic, the plaintiff would have been hired (or promoted)." <u>Id.</u> at 764 (emphasis in original).  The court of appeals, however, distinguished the plaintiff's burden at summary judgment, explaining that a plaintiff may avoid summary judgment by pointing to "some" evidence from which a fact-finder could reasonably conclude that the defendant's proffered reasons were pretextual:

> This basic framework under Title VII illustrates that, to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. . . . .

<u>Id.</u> at 764 (internal citations omitted). The court of appeals further clarified:

> In other words, because the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, . . ., a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

<u>Id.</u> (internal citations omitted).  Further, "if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." <u>Id.</u>

In this case, defendant argues that even if the court were to determine that plaintiff had met her burden in proving a prima facie case for the purpose of deciding the motion for summary judgment, as the court has so determined, defendant is entitled to summary judgment because defendant met its burden for articulating a legitimate reason for its decision not to reclassify plaintiff – namely, that she did not meet objective minimum job requirements.  Defendant met its "relatively light" burden of production by articulating a legitimate, non-discriminatory reason for denial of plaintiff's request for reclassification, Fuentes, 32 F.3d at 763.  Defendant put forward some evidence, taken as true, which would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.  For example, defendant introduced Ms. Grosky's position audit report which indicated her informed opinion that plaintiff should not be reclassified to Fiscal Technician.  See Def. App. at 49.

The court, however, following the approach set forth by the United States Court of Appeals for the Third Circuit in Fuentes notes that, for the same reasons set forth above in the discussion whether plaintiff had met her burden on the second element of her prima facie case, plaintiff sufficiently "discredit[ed] the proffered reasons, either circumstantially or directly" proffered by defendant in order to survive summary judgment.  See Fuentes, 32 F.3d at 764.  Even without examining the further evidence that plaintiff proffers as evidence of discrimination – for example, the voyeur incident and allegations that a male supervisor harassed her – plaintiff pointed to enough evidence to discredit defendant's proffered reasons and thus plaintiff's not otherwise time-barred claims will survive summary judgment.  See id. ("Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive

summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case.")

### *Conclusion*

After reviewing the undisputed material facts of record, the court determines that plaintiff's claims underlying her 2001 EEOC charge which were based upon discrete acts that fall outside of the 300-day statute of limitations for that charge are time-barred and plaintiff cannot recover for these claims.  Defendant is entitled to summary judgment with respect to these claims.  The court, however, for claims that are not otherwise time-barred, determines that plaintiff produced sufficient evidence by which a reasonable fact-finder could conclude that plaintiff met her burden of proving a prima facie case and that defendant's reason for failing to reclassify plaintiff to Fiscal Technician may have been pretextual.  Accordingly, summary judgment in favor of defendant for these claims is denied.

### *Order*

**AND NOW**, this 25th  day of September, 2006, upon consideration of the parties' arguments and supporting documents, **IT IS ORDERED** that defendant's motion for summary judgment (Doc. No. 30) is **GRANTED IN PART, DENIED IN PART** as more fully set forth herein.

By the court:


<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
United States District Judge

cc:     Counsel of record

34